FILED

2012 Dec-19  PM 04:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| RONNIE GUNTER, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 11-AR-0522-S |
| | } | |
| COCA COLA BOTTLING CO. | } | |
| UNITED, INC., | } | |
| | } | |
| Defendant. | } | |

## MEMORANDUM OPINION

There are several words to describe this case.  One of them is not "easy".  The court has before it the motion of defendant, Coca Cola Bottling Co. United, Inc. ("Coke United"), for summary judgment, seeking dismissal of the above-entitled action brought by plaintiff, Ronnie Gunter ("Gunter").  In his original complaint, Gunter alleged race discrimination and retaliation by his employer, Coke United, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*  He appended state law claims of intentional infliction of emotional distress and negligent hiring, supervision, training, and retention.  Since then, Gunter has withdrawn his race discrimination claim, and all of his state law claims.  This leaves only his claim of retaliation.[1]  For the reasons that follow, Coke United's motion for summary judgment will be denied.

---

[1] Gunter is the non-movant.  Rule 56, F.R.Civ.P., therefore requires that all admissible evidence, together with all reasonable inferences therefrom, be viewed in the light most favorable to Gunter.

**Background Information**

Coke United is a bottler and distributor of Coca Cola products. Gunter began working for Coke United in 2004. He was first assigned to duties as a maintenance mechanic on the second shift. After a year, he was transferred to first shift, where his primary responsibility was maintenance of production lines to prevent equipment breakdowns and stoppages of production. Charles Ryant ("Ryant") became Gunter's supervisor in March of 2009, and remained his supervisor until Gunter was terminated in August of the same year. Shortly after Ryant became Gunter's supervisor, Ryant evaluated Gunter's performance and noted no deficiencies.

Six to eight ("six", giving Gunter the benefit of the doubt) weeks before Gunter's termination, Emma Johnson, a black fellow employee, came to Gunter, who is white, and asked him to serve as a witness regarding her internal complaint of racial discrimination. The person or persons who were supposed to hear and react to Johnson's internal complaint are not reflected in the record. Gunter agreed to speak to Mike Hall, a supervisor, about Johnson's complaint, but told Johnson that Hall would have to approach him, rather than *vice versa*. The next day Hall did approach Gunter and inquired about Johnson's allegations. Presumably, Johnson, in response to Gunter's suggestion, had asked Hall to talk to Gunter. Gunter told Hall that he "didn't like the treatment that Charles [Ryant] was giving the employees there at

2

the plant," and intimated that Ryant treated the white employees under his supervision more favorably than he treated the black employees.  Doc. 18, Gunter's Depo. at 34.  Gunter did not share with Hall the recollection he voiced at his deposition that he had heard Ryant utter racial slurs[2].  After Gunter communicated to Hall his disapproval of Ryant's behavior, Hall attempted to explain to Gunter or to excuse Ryant's behavior by telling Gunter that Ryant was under a lot of pressure to keep his numbers up, and that Gunter needed to be a "team player."  This remark roughly translates to "go along to get along".  After this conversation between Gunter and Hall, they never spoke again about Ryant's behavior.  Gunter was never asked to sign a statement about the conversation and/or about the things he had observed and heard relating to Ryant.

**Gunter's Termination**

On August 12, 2009, Gunter was working as the line one mechanic.  The first shift schedule was from 5:00 a.m. until 3:00 p.m.  This ten-hour shift could be extended on the few occasions when production demanded it, in which event, presumably, the employees were paid overtime.  On August 12, shortly before the shift was supposed to end, the line one crew was informed, apparently by the grapevine, that it needed to stay until 4:00 p.m.. Gunter maintains that no supervisor or member of management

---

[2]These remarks included referring to blacks as "nigs", and saying things like "I am not impressed with his black ass."  Ryant denies ever making such racially offensive remarks.

personally told him of this one-hour extension, but he admits that he heard about it from another operator before he left the plant and punched out at 3:31 p.m., twenty-nine minutes before the newly announced quitting time. After Gunter learned of the extension, he tried three times to reach Ryant on the radio, and even went to find Ryant on another production line in order to tell him he needed to leave because he had a dental appointment at 4:30 p.m. Not being able to find Ryant, or any other supervisory employee, Gunter told Cleo Bearden, the lead utility person, about his scheduling problem. Shortly after Gunter left the plant, the filler machine ran out of oil, whereupon Ryant tried to contact Gunter about the need to refill it. Not being able to find Gunter, who had departed shortly before, Ryant had to get someone else to refill the oil. There was no production shut-down as a result of Gunter's absence.

On August 13, the next day after Gunter left without getting Ryant's permission, Gunter clocked in at 4:44 a.m., and worked as usual until the end of his shift at 3:00 p.m., when he was called into a meeting with managers Ryant, Hall, and Randy Murphree. Murphree asked Gunter why he had left early the previous day. Gunter responded that he had a dental appointment. The three supervisors, who obviously knew that Gunter had left before the end of the extended shift the day before, asked if Gunter had a note from his dentist, whereupon Gunter retrieved a note from his locker

4

and gave it to them. Murphree asked if Gunter had told any supervisor he was leaving before he left. Gunter said "no", but that he had tried to do so, and could not find a supervisor, so he told Bearden. The managers responded that it did not matter that he had told Bearden, and advised Gunter that the next time he needed to leave early he should tell a supervisor. Gunter explained that he did not know that he needed to tell a supervisor under the circumstances, because he left after 3:00 p.m., the end of the regular shift. They told him that if the plant ran after the end of regular shift time, he could not leave without a supervisor's permission. Gunter left the meeting with the impression that he would be written up for his alleged infraction. During the meeting, termination was never discussed as possible discipline.

Shortly after this August 13 meeting, Gunter ran into Bearden, who asked about the meeting. Apparently, Bearden knew about the meeting before it occurred. Gunter explained to Bearden that when the managers complained about his leaving early, he told them that he had informed Bearden about his dental appointment before he left. Bearden thereupon told Gunter that he was sorry, but "yesterday was a crazy day", and that he had not heard Gunter tell him he needed to leave. Bearden never denied to Gunter that Gunter tried to leave a message with him about his problem, but did testify that he did not pass on any such message to any supervisor

before Ryant started looking for Gunter.

On August 14, Gunter timely appeared for work, just as he had on August 12 and 13, and worked until he was called into Murphree's office to sign a disciplinary action for leaving on August 12 without telling a supervisor.[3]  Following the August 13 meeting, managerial personnel, namely, Gianetta Jones, the Regional Human Resources Manager over the Birmingham plant, Hall and Ryant, met and decided to terminate Gunter.  The reason given to Gunter on August 14 for his being terminated was that he had left early without telling a supervisor, an offense that his Employment Termination Form classified as "job abandonment."  Coke United's company work rules list among the offenses that are "grounds for immediate termination," "leaving the location of one's work premises during work hours without the permission of the supervisor".  Doc. 18, Ex. 2, to Gunter's Depo.  They make no mention of "job abandonment" as a ground for termination.

Paul Lammon was a second shift preventative maintenance mechanic who worked nights and weekends for Coke United, but who also occasionally worked on the day shift.  Mechanics on night shift did not have a regular or designated supervisor, but they routinely received their work orders from a supervisor named Ralph Sanders ("Sanders").  They reported to whatever other supervisor

---

[3]The Corrective Action Termination states that Plaintiff left early on August 13.  This was an error.  He actually left early on August 12, and was not fired until two days later.  This error goes unexplained by Coke United.  Its significance is a matter of debate.

was on duty if Sanders was not present.  It was understood between Sanders and Lammon, contrary to the written work rules, that when Lammon finished his work orders for the shift, he could leave work. However, Sanders orally recommended to Lammon that, as a courtesy, he should inform the shift supervisor before leaving early.  On February 9, 2009, after finishing all of the day's work orders, Lammon clocked out and left work without informing a supervisor he was leaving.  On February 12, 2009, three days later, Lammon received a written warning from Sanders for failing to inform his supervisor that he was leaving.  Stacye Collier from Human Resources asked Sanders why Lammon was not terminated as called for by the written work rules.  Sanders told her that his instruction to Lammon was not contrary to the rules, but a mere call for "courtesy."  Why such a "discourteous" act called for a warning goes unexplained.  Sanders insisted that what happened was not a violation of Coke United's written policy.

The only significant difference between Lammon's situation and Gunter's situation is that Lammon had never previously complained about racist conduct by managerial personnel.

Section IV of the Employee Handbook distributed by Coke United to all of its employees provided, *inter alia*, as follows:

> **SUMMARY OF ADDITIONAL SELECTED COMPANY POLICIES**
>
> With the goal of operating an efficient plant and maintaining a safe, productive work environment, the company has established the following disciplinary guidelines.  The following lists are not all-inclusive, but represent violations of company policy, which will subject the employee to progressive discipline, up to, and including

termination.

**The progressive disciplinary procedure is as follows:**

| | |
|---|---|
| 1st **Offense** | **Verbal Warning** |
| 2nd **Offense** | **Written Warning** |
| 3rd **Offense** | **Written Warning and 2-Day Suspension** |
| 4th **Offense** | **Termination of Employment** |

**The following offenses are grounds for progressive discipline:**

1.)   Personal work on company time.
2.)   Violation of company rules or other personal conduct at work that is dangerous to others.
3.)   Solicitation on company premises or in other work area by an employee for any cause, without approval of the Department Manager and Human Resources Manager.
4.)   Distribution of literature on company premises in other work areas by an employee for any cause, during work hours, without approval of the Department Manager or Human Resources Manager.
5.)   Tardiness in reporting to work.
6.)   **Stopping work or leaving your workstation before break, lunch, or end of shift without authorization of the supervisor.**
7.)   Returning late from lunch and breaks.
8.)   Unexcused absence.
9.)   Excessive current absenteeism.
10.)  Failure to punch timecard; sign in/out at the Beehive or other non-plant workstations, or comply with any other procedure designed to account for total time an employee works.
11.)  Visiting other departments during work hours, except as required by regular duties.
12.)  Interfering with other employees in the workplace.
13.)  Poor or careless work.
14.)  Smoking in areas where it is prohibited.
15.)  Violation of employee appearance guidelines.
16.)  Chargeable accident while operating any company vehicle.
17.)  Sleeping on the job.

**The following offenses are grounds for immediate termination:**

1.)   Falsification of records or misrepresentation of company records or other material information.
2.)   Reporting for work or working under the influence of, or possession of illegal drugs or alcohol on company premises.
3.)   Possession of a firearm or weapon of any type other than pocketknives with blades no longer than three inches.
4.)   Intentionally defacing or damaging customer or company property.
5.)   Fighting on company property, except in unprovoked cases of clear self-defense, striking or physically threatening, intimidating, or coercing a fellow employee.
6.)   Punching another employee's timecard.
7.)   Stealing, taking, borrowing without permission, or in

any way converting to an employee's own use, any private or company property.

8.) Refusal to obey work-related orders of any supervisor or other appropriate authority (e.g. lead person, a helpers Route Salesman), or any other behavior, such as verbal abuse toward a supervisor, which amounts to insubordination.

9.) Concerted or willful action to either restrict production or to endanger the safety of an employee.

10.) Refusal to submit to a required drug/alcohol test or personal property search.

11.) Failure to ring up cash sale immediately on the cash register.

12.) **Leaving the location of one's work premises during work hours without the permission of the supervisor.**

13.) **Other individual employee actions or inactions, which, in the opinion of the company, are sufficiently detrimental to the interest of the company or its employees as to warrant immediate termination.**

(emphasis added).

Pregnant language in the above-quoted work rules has been emphasized.

### Does Gunter State a Colorable Retaliation Claim?

Gunter claims that he was disciplined in the form of termination for his having engaged in an activity protected by Title VII. To make such a claim, Gunter must establish that: "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If Gunter has proffered proof of these three things, and thus made out a *prima facie* case, Coke United can nevertheless escape liability by articulating a legitimate non-retaliatory reason for its adverse employment action, whereupon Gunter would have the burden of proving that the articulated reason is a pretext. *Id.*

9

**Was Gunter's Expression to Hall on Behalf of Johnson Protected by Title VII?**

Coke United first argues that Gunter did not engage in a statutorily protected activity.  Title VII prohibits an employer from discriminating against an employee (1) "because he has opposed" discrimination prohibited by Title VII (the "opposition clause"), or (2) "because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing" under Title VII (the "participation clause").  42 U.S.C. § 2000e-3(a).

Gunter says that he engaged in both of these protected activities.  He told Hall that Ryant did not treat black employees fairly.  He was obviously backing up Johnson's similar claim.  Doc. 22 at 43. Coke United says that this was not a protected activity because it was part of an internal investigation, and not part of a formal EEOC proceeding.  Title VII's "participation clause" protects employees for engaging in activities "which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC." *E.E.O.C. v. Total System Services, Inc.* 221 F.3d 1171, 1174 (11th Cir. 2000).  Neither Gunter nor Johnson had filed a complaint with the EEOC when Gunter had his conversation with Hall. Therefore, Coke United is correct that Gunter's activity was not protected under the "participation clause."  However, Gunter's

10

activity was clearly protected under the "opposition clause." Coke United's only argument regarding the "opposition clause" is that "[t]here can be no dispute that the plaintiff does not qualify for the protection of the opposition clause as he never complained to Coke United about Ryant's alleged racial statements." Doc. 23 at 14. Defendant cites no authority for this proposition. To demonstrate participation in an activity protected by the opposition clause, the employee must only show (1) that he engaged in opposition and (2) that he subjectively believed the employer was engaged in discriminatory practices and that this belief was objectively reasonable. 42 U.S.C. § 2000e-3; *Butler v. Ala. Dep't of Transp.* 536 F.3d 1209 (11th Cir. 2008). While Gunter admits that he did not tell Hall about Ryant's racial slurs, he did tell Hall that he "didn't like the treatment that Charles [Ryant] was giving the black employees...at the plant." Doc. 21, Gunter's Depo at 34. This was enough to constitute a complaint about conduct proscribed by Title VII. The Supreme Court has held that "oppose" carries its ordinary meaning: "to resist or antagonize...; to contend against; to confront; resist; withstand." *Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.,* 555 U.S. 271, (2009), *citing* Webster's New International Dictionary 1710 (2d ed. 1958). Gunter clearly expressed disdain for Ryant's behavior. Therefore, he "resisted" or "contended against" it, and thus he arguably "opposed" it. Furthermore, the Supreme Court has said

11

that "opposing" an employer's actions includes "responding to someone else's question just as surely as by provoking the discussion." *Id.* at 277. Even though Gunter did not approach Hall, his response to Hall's inquiry constituted "opposition" to racially disparate treatment.

For Gunter to establish that he engaged in a protected activity he must have had a subjective belief that Coke United was engaging in racially discriminatory activity, and this belief must also have been objectively reasonable. Gunter at deposition testified that he heard Ryant use racial slurs and that Ryant treated white employees more favorably than black employees. Gunter's Depo at 123 and 115. This provided an evidentiary basis for Gunter to have subjectively believed that Coke United was violating Title VII. Based on the facts before the court, a trier of fact could also find that Gunter's belief was objectively reasonable. Gunter has said that Ryant did not treat black employees fairly, and Coke United does not argue the fact that Gunter did not describe to Hall a particular incident of racist conduct by Ryant.[4] The burden is on the parties, not the court, to formulate arguments at the summary judgment stage. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

---

[4] "The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law" *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999). Under existing case law, a plaintiff attempting to make out a *prima facie* case of discrimination must establish, among other things, that an adverse employment action occurred. *See McDonnell Douglas Corp v. Green*, 411 US 792 (1973).

Therefore, there is a question of fact as to whether Gunter's belief was objectively reasonable.

Gunter has met the first element of a *prima facie* case of retaliation, namely, that he engaged in a statutorily protected activity.

**Did Gunter Suffer an Adverse Employment Action?**

The next element of a *prima facie* case, namely, that Gunter suffered an adverse employment action, is undisputed.  He was fired.  Nothing could be a more adverse action unless it was being beaten with a stick on the way out the door.

**Was There a Casual Connection?**

Gunter must also demonstrate that there is a causal relation between the protected activity and the adverse action. Gunter was fired on August 14, 2009.  He testified that the firing occurred "six to eight weeks" after he engaged in the statutorily protected activity. Doc. 22 at 28. Under Rule 56 analysis, this is deemed to mean"six weeks."  "To establish a causal connection, a plaintiff must show that the decision maker was aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Summers v. City of Dothan, Ala*, 444 F. App'x 346, 351 (11th Cir. 2011), *citing Shannon v. BellSouth Telecomms., Inc.* 292 F.3d 712, 716 (11th Cir. 2002).  Hall, who was clearly aware of Gunter's protected conduct, and Ryant, who was the subject of Gunter's comment to Hall, both participated in the

decision to fire Gunter, thus satisfying the requirement that a decision-maker be aware of the protected conduct.  A relationship between the protected conduct and the adverse employment decision can be shown by an abbreviated amount of time that passed between the two events.  The Eleventh Circuit has said: "[c]lose temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Id.*[5] Gunter's conversation with Hall and Gunter's termination were close enough in temporal proximity for a trier of fact to conclude that the two were not "wholly unrelated," and thus that there is sufficient evidence of a causal connection to make out a jury case on the causation element.[6]

### Has Coke United Articulated a Legitimate Reason for Firing Gunter?

Because Gunter has established all elements of a *prima facie* case of retaliation, the question now becomes whether Coke United is able to come up with a legitimate reason for firing Gunter.

---

[5] The Supreme Court has examined "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case" and said that the temporal proximity must be "very close." *Clark County Dist. v. Breeden*, 532 US 268, 273-4 (2001) (holding that 20 months is insufficient to establish causality.

[6] The Eleventh Circuit elaborated on what the Supreme Court meant by "very close" when it held that a temporal proximity of seven weeks between the protected activity and the adverse action satisfies the causation requirement. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (1999) However, it has also held that a two-month gap between events was not close enough to establish temporal proximity. *Williams v. Waste Management, Inc.*, 411 F.App'x 256 (11th Cir. 2011). Based on this precedent, there is a question of fact whether the 6-8 weeks that passed between these two events was a close enough temporal proximity to indicate a causal connection between the events.

Coke United says Gunter was fired for leaving work early and failing to notify a supervisor before he left.  This is not inconsistent with Coke United's written policy that:  "[l]eaving the location of one's work premises during work hours without the permission of the supervisor" is an offense that is "grounds for immediate termination."  Doc. 18, Ex.2 to Gunter Dep. at 4.  The Eleventh Circuit has referred to the employer's burden here as "exceedingly light."  *See Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491 (11th Cir. 1989).  Because Coke United has articulated a legitimate reason that has support in the record, it has met its burden of passing back to Gunter the ultimate burden of proving a Title VII violation.

### Does Gunter Have Enough Evidence to Make Pretext Into a Jury Question?

Coke United having articulated a facially plausible reason for Gunter's termination, the burden shifts to Gunter to establish, if he can, that Coke United's stated reason was mere pretext.  *See Pennington v. City of Huntsville*, 261 F.3d 1262 (11th Cir. 2001). In discussing a plaintiff's ultimate burden under Title VII, the Eleventh Circuit has said:  "[a] plaintiff in a discrimination case based on circumstantial evidence can avoid judgment as a matter of law by ...producing **evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions.**"  (emphasis added). *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997).

Gunter has succeeded in producing enough evidence to discredit Coke United's articulated legitimate reason and to provide Gunter an opportunity to present his claim to a jury.  The jury, of course, may agree with him or disagree with him.

As stated previously, Coke United's escape under Rule 56 consideration depends upon whether Gunter can overcome with some evidence Coke United's assertion that he was fired for violating a company rule.  In an unpublished opinion, the Eleventh Circuit recently addressed this very issue as follows:

> [F]or purposes of summary judgment, an employer's assertion that an employee was fired for violating a work rule is "arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated."

*Bush v. Houston County Comm'n*, 414 F. App'x 264, 267 (11th Cir. 2011), *quoting Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).  This expression by the Eleventh Circuit introduces the "comparator" concept as a means for Gunter to prove pretext.  This concept need not be elaborated here.

This court recognizes that it is not the wisdom of an employer's decision that is being evaluated, but whether the employer's decision was so unreasonable as to call into question the decision-maker's own belief in the reason he offers for his decision.  The court is not called upon to decide whether Coke United's articulated reason was, in fact, pretextual, but whether

16

there are enough evidentiary building blocks upon which Gunter can mount a plausible argument for pretext.

Construed in Gunter's favor, there are several facts that create possibilities for Gunter to argue pretext.

A work rule that arguably applied to Gunter, but that conspicuously has not been relied upon by Coke United, reads as follows:

The following offenses are **grounds for progressive discipline**:

\* \* \*

(6)   Stopping work or leaving your work station before break, lunch, or **end of shift without authorization of the supervisor**.

(emphasis added).

Although Gunter admittedly left his work station before the end of his elongated shift without express authorization from his supervisor, if this act violated the above-quoted rule, it would only call for **progressive** discipline, far short of **termination**. The absence of reliance by Coke United on this rule provides a basis for arguing that it wanted Gunter's termination, the most drastic form of discipline, getting rid of him for good.  The termination notice expressly precluded any future employment of Gunter by Coke United.

The work rule that is here relied upon by Coke United as the basis for its termination decision reads as follows:

The following offenses are **grounds for immediate termination**:

17

* * *

    (12) **Leaving the location of one's work premises during work hours without the permission of the supervisor.**

(emphasis added).

There are several problems with Coke United's hyper-aggressive application of this rule to Gunter.

    First, the words "**grounds for**" are markedly different from the words "**calling for automatic termination without exception,**" or words of like effect. This court has, on many occasions, found good "**grounds**" for administering a punitive sanction, but has decided not to impose a sanction, or to impose a light sanction, because the violation was more inadvertent than deliberate. To demonstrate that not adhering to the precise language of this rule does not invariably result in termination, Gunter points to the incident in which Lammon obviously violated the very same work rule, but was only written up. Sanders, Lammon's supervisor, provided more favorable treatment for Lammon than Ryant provided for Gunter. Sanders orally modified the same work rule to allow Lammon to leave the plant before his shift ended if his assigned work duties had been completed. Sanders only **suggested** to Lammon that "as a courtesy" he notify his supervisor before leaving. There is no such exception in the written rule as purportedly applied to Gunter. In fact, Lammon's violation of the literal language of the rule was arguably more egregious than Gunter's

because Lammon left before his **regular** shift ended, whereas Gunter did not.  Where and how Sanders obtained the authority to vary a rule that, if violated, would constitute a ground for termination, is anybody's guess.  Gunter and Sanders were similarly situated enough to make Lammon a "comparator."  The only significant distinction between Lammon's and Gunter's leaving early was that Lammon had not previously criticized any supervisor for racist behavior.  No "comparator" is perfect, but the comparison between Gunter and Lammon is probative enough to create or enhance a suspicion of pretext.

Second, do the words "work hours" in the rule invoked by Coke United mean "the **regular** shift hours," or "the hours of an employee's shift plus any extension, or no matter how lengthy the extension may be, and no matter what inconvenience the extension causes the employee?"  Apparently, Sanders interpreted the rule loosely enough to make it fit Lammon's circumstances.  The words "work hours" are ambiguous enough to cause confusion.

Third, the words that require permission from "**the** supervisor," literally construed, mean that the permission must obtained from **one** person.  The word "the," followed by a singular noun, necessarily implies one particular person.  In other words, if Ryant was **the** supervisor, as Coke United contends, he could not be located by Gunter, even though Gunter tried to reach him on the radio.  The rule did not provide an alternative person from whom

permission could be sought.  The rule did not say "**a** supervisor", or "**some** supervisor."  What was Gunter to do when he could not find "**the** supervisor?"  The rule was sufficiently ambiguous to be bothersome.

Fourth, Coke United did not fire Gunter "**immediately**" after it learned that Gunter had left without permission.  Instead, Gunter was called in after he put in a full day's work the next day and was asked to explain himself.  He told the interrogators about his dental appointment, whereupon they asked him if he had a note from his dentist.  Why would they ask him for an excuse and about a note if termination was automatic without regard to what his excuse might be?  Asking him for a note, which he was able to provide, constitutes evidence that the termination decision was a matter of discretion, and was not automatic.  In other words, the employer's initial reaction, which was not "immediate," was consistent with **progressive** discipline, and not a reason for **termination**.  There is absolutely nothing in Coke United's rules or policies to allow a supervisor to orally amend the written rules to allow someone to leave the premises before his shift ended, whether or not the employee first informed the shift supervisor that he was leaving. Sander's variation of the rule did not even require the supervisor's permission, but only that a supervisor be **informed** of the early departure.

It is hard, if not impossible, to argue that Gunter's

termination, which occurred two days after his alleged infraction, was "**immediate.**"  What was Coke United waiting for?

Fifth, the "ground" for immediate termination, listed in the work rules, following the rule here relied upon by Coke United, reads as follows:

> (13) Other individual employee actions or inactions, which, in the opinion of the company, are sufficiently detrimental to the interest of the company or its employees as to warrant immediate termination.

This open-ended rule, in and of itself, proves that termination is not "automatic" for a violation of any of the work rules, and that an exercise of judgment or discretion by the employer is always called for.  If this final rule, not here relied upon by Coke United, is construed literally, it would be possible that employee criticism of a supervisor's attitude toward black employees could be found so "detrimental to the interest of the company" as to "warrant immediate termination."  This is not to suggest that this reasoning was actually employed by Coke United, but it is to suggest that termination was not automatic.

Sixth, the supervisors who met with Gunter on August 13 (and again on August 14, an error in paperwork), told Gunter what to do the "**next time**" he needed to leave early. If termination was inexorable, why was such a warning given?

Seventh, what does "job abandonment" mean?  It sounds more like not showing up for work for several days than leaving a few minutes early.

These pieces of the puzzle, in the aggregate, provide enough evidence of "pretext" to take this case to a jury.

**Conclusion**

For the foregoing reasons, Coke United's motion for summary judgment will be denied by separate order.

DONE this  19th  day of December, 2012.

_____

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

22